FILED
2018 Aug-06  PM 01:03
U.S. DISTRICT COURT
N.D. OF ALABAMA

## FINANCIAL INDUSTRY REGULATORY AUTHORITY
## DISPUTE RESOLUTION

IN THE MATTER OF THE ARBITRATION OF:

| | |
|---|---|
| MICHAEL CHARLES WARR, | * |
|         CLAIMANT, | *  CASE NO. _____ |
|    V. | * |
| | * |
| MORGAN STANLEY & CO. LLC, | * |
|         RESPONDENT. | * |
| | * |

**************************************************

## STATEMENT OF CLAIM

As his Statement of Claim, Mr. Michael C. Warr (the "Claimant"), by the undersigned attorney, hereby requests arbitration with an expungement hearing, either telephonically or by video conference, before FINRA Dispute Resolution regarding the following allegations against Morgan Stanley & Co. LLC (the "Respondent") pursuant to customer dispute occurrence number 1451227 (the "Underlying Claim"):

## THE PARTIES

1.     The Claimant, Michael C. Warr (CRD #3187674), is a resident of Tuscaloosa, Alabama. He has been working in securities since April of 1999 and is currently a financial advisor at Morgan Stanley Private Bank, National Association and with Morgan Stanley in Tuscaloosa, Alabama. He has one customer dispute on his Central Registration Depository ("CRD") record. (*see*, Exhibit 1)

2.     The Respondent, Morgan Stanley & Co. LLC (CRD #8209) (f/k/a Morgan Stanley & Co. Incorporated), is a currently registered securities broker-dealer firm and a previously registered investment adviser firm. Between April of 2008 and June of 2009, the Respondent

employed the Claimant as a financial advisor and branch manager in Tuscaloosa, Alabama. (*see*, Exhibit 1)

## FACTUAL BACKGROUND

3.    The information herein is to the best of the Claimant's recollection in the absence of substantiating documentation.

4.    In or around October of 2004, Mr. John E. Jarvis (the "Customer") became a client of the Claimant by way of referral. He was seeking a professional to help with his investments, because he was dissatisfied with the returns that he had been receiving with his previous advisor. At that time, the Claimant was working at Merrill Lynch, Pierce, Fenner & Smith Incorporated. (*see*, Exhibit 1)

5.    The Customer was approximately 66 years old. He was self-employed at Jarvis Trucking with an annual income of $200,000, and he had a liquid net worth of $2 million. He was a significantly practiced investor with approximately 25 years of investment experience. Through personal interviews, the Claimant and the Customer ascertained the Customer's investment objective to be income with a moderate risk tolerance and a long-term investment time horizon of 11 to 20 years. The Customer did not expect to require any liquidity for 11 to 20 years.

6.    The Claimant met with the Customer on two separate occasions to discuss various potential investments that were suitable for the Customer's needs, including mutual funds, bonds, and annuities. In one meeting, the Claimant presented an investment proposal that featured an annuity. All aspects of annuities, including surrender fees and penalties, were disclosed verbally and in written materials that the Customer received and was required to read and sign prior to purchasing any annuity product. After two meetings, the Customer elected to invest 98% of his portfolio with the Respondent into the purchase an annuity.

7.      On December 7, 2006, an annuity (the "Disputed Investment") was acquired for the Customer.

8.      In March of 2007, signs of the subprime mortgage crisis that led to the 2007 to 2009 recession in the United States were becoming apparent due to events such as the failure of Bear Stearns. Though the markets continued seemingly healthily until they reached a closing high on October 9, 2007, they later declined significantly into December of 2007, when the United States fell into a recession. (*see*, Exhibit 2)

9.      Following the Customer's purchase of the Disputed Investment, the Claimant spoke with the Customer at least ten times. The Customer made infrequent trades, and verbal authorization was standard.

10.     In April of 2008, the Claimant transferred his registration to the Respondent, and the Customer chose to bring his accounts over to the Respondent along with the Claimant. (*see*, Exhibit 1)

11.     In early July of 2008, the Dow Jones Industrial Average (the "Dow") traded at a two-year low. (*see*, Exhibit 2)

12.     On September 7, 2008, after the markets had declined nearly 20% since their previous peaks in October of 2007, the U.S. government announced plans to take over Fannie Mae and Freddie Mac due to losses resulting from the subprime mortgage crisis. (*see*, Exhibit 2)

13.     On September 14, 2008, Lehman Brothers announced "the largest bankruptcy filing in U.S. history at that time." The following day, the markets declined sharply, with the Dow closing down 499 points. (*see*, Exhibit 2)

14.     On September 29, 2008, the Dow experienced its largest drop in history of 774 points. (*see*, Exhibit 2)

15.     On October 2, 2008, three days later, the Customer surrendered the Disputed Investment. Upon surrendering the Disputed Investment, the Customer incurred a surrender fee, and, due to the timing of the surrender, the Customer received less money back than he had anticipated.

16.     The Disputed Investment had performed favorably relative to industry benchmarks. Between its acquisition and its surrender to cash, the performance of the Disputed Investment was -27.0%. Over a similar period of time, from December 2006 through October 2008, the return of the Dow was -25.8, and the return of the Standard & Poor's 500 was -31.5%. (*see*, Exhibits 3, 4)

17.     When the Customer spoke with the Claimant about receiving less cash from the Disputed Investment than he had anticipated, the Claimant explained how the timing of the annuity surrender was not ideal, as the Customer had chosen to execute said surrender three days after the Dow had experienced its largest decline in history. The Claimant also reminded the Customer about their discussions regarding the surrender fees associated with the Disputed Investment.

18.     On December 30, 2008, the Customer orally alleged that the Respondent was "untimely in its reallocating of his annuity." The Customer sought unspecified compensatory damages. (*see*, Exhibit 1)

19.     On March 13, 2009, the Respondent settled with the Customer in the amount of $31,058.96, a nominal amount in light of the cost of defending against arbitration or litigation and pursuant to its fiduciary duty to its shareholders. The Claimant did not contribute to the settlement. (*see*, Exhibit 1)

20.     Notably, the Claimant and the Customer maintained a professional relationship for several years after the surrender of the Disputed Investment. The Customer did not liquidate his accounts with the Claimant and the Respondent until September of 2012.

21.     The Customer's claim that the Respondent was "untimely in its reallocating of his annuity" as reported to the Claimant's CRD report and BrokerCheck, is clearly erroneous, factually impossible, and false and, therefore, meets both the FINRA Rule 2080(b)(1)(A) standard and the Rule 2080(b)(1)(C) standard for expungement. (*see*, Exhibit 1)

       a.  The claim is false, because, as a condition of the sale of the Disputed Investment, the Customer signed paperwork detailing all associated risks, surrender fees, and penalties. The Customer's signed acknowledgment of the involved risks and penalties was a prerequisite to purchasing the Disputed Investment, and, thus, contradicts his claim of wrongdoing on the part the Respondent. While the Customer may have been unhappy with the performance of the Disputed Investment, said performance was in no way a result of any action on the part of the Claimant.

       b.  The claim is clearly erroneous, because the allegations specifically state that the customer accused the Respondent, and not the Claimant, of an untimely allocation. Furthermore, the Customer failed to provide any specific information detailing how the Respondent failed to reallocate his annuity in a timely manner or the timeframe for the purported reallocation.

       c.  The claim is false, because the Customer claimed that he had no need for liquidity for 11 to 20 years. Had he chosen to hold the Disputed Investment for the long term, as he initially had planned, he may not have suffered such losses upon the surrender of the Disputed Investment, which he chose to surrender less than two years after its purchase.

       d.  The claim is false, because the lack of timeliness of the surrender of the Disputed Investment was entirely the Customer's choice. The lowered value of

the Disputed Investment was due to the unprecedented financial downturn of 2008, wherein the Dow hit a record low several days prior to the Customer's surrender of the Disputed Investment. The Claimant could not have been reasonably expected to foresee such a drastic market downturn as early as 2006, when the Disputed Investment was purchased, nor did he recommend that the Customer surrender the Disputed Investment in the wake of said downturn.

e. The claim is clearly erroneous, factually impossible, and false, because the Claimant had no control over, nor any responsibility for, the Respondent's reallocation of the Disputed Investment.

22.     Since the Claimant was not responsible for the timeliness of the reallocation or the surrender of the Disputed Investment, and since he performed his duties as a representative in a thorough, ethical, and professional manner, the public disclosure of the patently false allegation herein does not offer any public protection and has no regulatory value. If not expunged, this customer dispute will mislead any person viewing the Claimant's CRD record and will not provide valuable information for knowledgeable decision making.

## RELIEF REQUESTED

23.     The Claimant requests expungement of the Underlying Claim from his CRD record pursuant to FINRA Rule 2080(b)(1)(A), as the claim, allegation, or information is factually impossible or clearly erroneous.

24.     The Claimant requests expungement of the Underlying Claim from his CRD record pursuant to FINRA Rule 2080(b)(1)(C), as the claim, allegation, or information is false.

25.     The Claimant requests an award of compensatory damages in the amount of $1.00 from the Respondent.

26.     The Claimant requests any and all other relief that the Arbitrator deems just and equitable.

Respectfully submitted,

Owen Harnett, J.D.
Associate Attorney
T: (720) 523-8118
E: Owen@advisorlawyer.com

AdvisorLaw, LLC
3400 Industrial Lane, Unit 10A
Broomfield, CO 80020

Date: October 11, 2017

Exhibit 1 – Michael C. Warr BrokerCheck Report and CRD Individual Snapshot Report, dated
          October 11, 2017

Exhibit 2 – "The Fall Of The Market In The Fall Of 2008" Investopedia article, not dated

Exhibit 3 – "History Suggests Dow's Bull Run Still Has Legs" Forbes article, dated December
          30, 2013

Exhibit 4 – "Inside the S&P 500 - The Dividend Aristocrats" Indexology blog, dated December
          12, 2014

# EXHIBIT 1



**BrokerCheck Report**

MICHAEL CHARLES WARR

CRD# 3187674

| Section Title | Page(s) |
| --- | --- |
| Report Summary | 1 |
| Broker Qualifications | 2 - 4 |
| Registration and Employment History | 5 |
| Disclosure Events | 6 |



**About BrokerCheck®**

BrokerCheck offers information on all current, and many former, registered securities brokers, and all current and former registered securities firms. FINRA strongly encourages investors to use BrokerCheck to check the background of securities brokers and brokerage firms before deciding to conduct, or continue to conduct, business with them.

- **What is included in a BrokerCheck report?**

  - BrokerCheck reports for individual brokers include information such as employment history, professional qualifications, disciplinary actions, criminal convictions, civil judgments and arbitration awards. BrokerCheck reports for brokerage firms include information on a firm's profile, history, and operations, as well as many of the same disclosure events mentioned above.

  - Please note that the information contained in a BrokerCheck report may include pending actions or allegations that may be contested, unresolved or unproven. In the end, these actions or allegations may be resolved in favor of the broker or brokerage firm, or concluded through a negotiated settlement with no admission or finding of wrongdoing.

- **Where did this information come from?**

  - The information contained in BrokerCheck comes from FINRA's Central Registration Depository, or CRD® and is a combination of:
    - o information FINRA and/or the Securities and Exchange Commission (SEC) require brokers and brokerage firms to submit as part of the registration and licensing process, and
    - o information that regulators report regarding disciplinary actions or allegations against firms or brokers.

- **How current is this information?**

  - Generally, active brokerage firms and brokers are required to update their professional and disciplinary information in CRD within 30 days. Under most circumstances, information reported by brokerage firms, brokers and regulators is available in BrokerCheck the next business day.

- **What if I want to check the background of an investment adviser firm or investment adviser representative?**

  - To check the background of an investment adviser firm or representative, you can search for the firm or individual in BrokerCheck. If your search is successful, click on the link provided to view the available licensing and registration information in the SEC's Investment Adviser Public Disclosure (IAPD) website at https://www.adviserinfo.sec.gov. In the alternative, you may search the IAPD website directly or contact your state securities regulator at http://www.finra.org/Investors/ToolsCalculators/BrokerCheck/P455414.

- **Are there other resources I can use to check the background of investment professionals?**

  - FINRA recommends that you learn as much as possible about an investment professional before deciding to work with them. Your state securities regulator can help you research brokers and investment adviser representatives doing business in your state.

-

**Thank you for using FINRA BrokerCheck.**



Using this site/information means that you accept the FINRA BrokerCheck Terms and Conditions. A complete list of Terms and Conditions can be found at brokercheck.finra.org



For additional information about the contents of this report, please refer to the User Guidance or www.finra.org/brokercheck. It provides a glossary of terms and a list of frequently asked questions, as well as additional resources. For more information about FINRA, visit www.finra.org.

www.finra.org/brokercheck





# MICHAEL C. WARR

CRD# 3187674

**Currently employed by and registered with the following Firm(s):**

**MORGAN STANLEY**
1657 NORTH MCFARLAND BLVD.
SUITE G3E
TUSCALOOSA, AL 35406
CRD# 149777
Registered with this firm since: 06/01/2009

## Report Summary for this Broker

This report summary provides an overview of the broker's professional background and conduct. Additional information can be found in the detailed report.

### Broker Qualifications

**This broker is registered with:**

- 4 Self-Regulatory Organizations
- 23 U.S. states and territories

**This broker has passed:**

- 2 Principal/Supervisory Exams
- 2 General Industry/Product Exams
- 1 State Securities Law Exam

### Registration History

**This broker was previously registered with the following securities firm(s):**

**MORGAN STANLEY & CO. INCORPORATED**
CRD# 8209
TUSCALOOSA, AL
04/2008 - 06/2009

**MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED**
CRD# 7691
TUSCALOOSA, AL
04/1999 - 04/2008

### Disclosure Events

All individuals registered to sell securities or provide investment advice are required to disclose customer complaints and arbitrations, regulatory actions, employment terminations, bankruptcy filings, and criminal or civil judicial proceedings.

Are there events disclosed about this broker?    **Yes**

**The following types of disclosures have been reported:**

| Type | Count |
|------|-------|
| Customer Dispute | 1 |

### Investment Adviser Representative Information

The information below represents the individual's record as a broker. For details on this individual's record as an investment adviser representative, visit the SEC's Investment Adviser Public Disclosure website at
https://www.adviserinfo.sec.gov

©2017 FINRA. All rights reserved. Report about MICHAEL C. WARR.



www.finra.org/brokercheck

User Guidance

# Broker Qualifications

## Registrations

This section provides the self-regulatory organizations (SROs) and U.S. states/territories the broker is currently registered and licensed with, the category of each license, and the date on which it became effective. This section also provides, for every brokerage firm with which the broker is currently employed, the address of each branch where the broker works.

**This individual is currently registered with 4 SROs and is licensed in 23 U.S. states and territories through his or her employer.**

## Employment 1 of 1

Firm Name:              MORGAN STANLEY
Main Office Address:    2000 WESTCHESTER AVENUE
                        PURCHASE, NY 10577-2530
Firm CRD#:              149777

| SRO | Category | Status | Date |
|---|---|---|---|
| FINRA | General Securities Representative | APPROVED | 06/01/2009 |
| FINRA | General Securities Sales Supervisor | APPROVED | 06/01/2009 |
| NYSE American LLC | Branch Office Manager (NYSE) | APPROVED | 06/17/2011 |
| NYSE American LLC | General Securities Representative | APPROVED | 06/17/2011 |
| Nasdaq Stock Market | General Securities Representative | APPROVED | 06/01/2009 |
| Nasdaq Stock Market | General Securities Sales Supervisor | APPROVED | 06/01/2009 |
| New York Stock Exchange | Branch Office Manager (NYSE) | APPROVED | 06/01/2009 |
| New York Stock Exchange | General Securities Representative | APPROVED | 06/01/2009 |

| U.S. State/ Territory | Category | Status | Date | U.S. State/ Territory | Category | Status | Date |
|---|---|---|---|---|---|---|---|
| Alabama | Agent | APPROVED | 06/01/2009 | Georgia | Agent | APPROVED | 06/01/2009 |
| Arkansas | Agent | APPROVED | 06/01/2009 | Kentucky | Agent | APPROVED | 07/26/2017 |
| California | Agent | APPROVED | 06/01/2009 | Louisiana | Agent | APPROVED | 06/01/2009 |
| Colorado | Agent | APPROVED | 01/18/2017 | Massachusetts | Agent | APPROVED | 05/14/2010 |
| Connecticut | Agent | APPROVED | 06/04/2015 | Michigan | Agent | APPROVED | 06/01/2009 |
| Delaware | Agent | APPROVED | 06/01/2009 | Mississippi | Agent | APPROVED | 06/01/2009 |
| Florida | Agent | APPROVED | 07/14/2009 | New Jersey | Agent | APPROVED | 03/29/2016 |

©2017 FINRA. All rights reserved. Report about MICHAEL C. WARR.

www.finra.org/brokercheck

User Guidance



# Broker Qualifications

## Employment 1 of 1, continued

| U.S. State/ Territory | Category | Status | Date |
|---|---|---|---|
| New York | Agent | APPROVED | 04/09/2013 |
| North Carolina | Agent | APPROVED | 06/01/2009 |
| Pennsylvania | Agent | APPROVED | 04/08/2016 |
| South Carolina | Agent | APPROVED | 06/01/2009 |
| Tennessee | Agent | APPROVED | 06/01/2009 |
| Texas | Agent | APPROVED | 06/01/2009 |
| Virginia | Agent | APPROVED | 10/22/2013 |
| Washington | Agent | APPROVED | 09/28/2015 |
| West Virginia | Agent | APPROVED | 09/20/2017 |

## Branch Office Locations

**MORGAN STANLEY**
1657 NORTH MCFARLAND BLVD.
SUITE G3E
TUSCALOOSA, AL  35406

©2017 FINRA. All rights reserved. Report about MICHAEL C. WARR.

www.finra.org/brokercheck

User Guidance



# Broker Qualifications

## Industry Exams this Broker has Passed

This section includes all securities industry exams that the broker has passed. Under limited circumstances, a broker may attain a registration after receiving an exam waiver based on exams the broker has passed and/or qualifying work experience. Any exam waivers that the broker has received are not included below.

**This individual has passed 2 principal/supervisory exams, 2 general industry/product exams, and 1 state securities law exam.**

### Principal/Supervisory Exams

| Exam | Category | Date |
|---|---|---|
| General Securities Sales Supervisor - Options Module Examination | Series 9 | 06/26/2004 |
| General Securities Sales Supervisor - General Module Examination | Series 10 | 07/08/2004 |

### General Industry/Product Exams

| Exam | Category | Date |
|---|---|---|
| General Securities Representative Examination | Series 7 | 04/07/1999 |
| Futures Managed Funds Examination | Series 31 | 08/12/2004 |

### State Securities Law Exams

| Exam | Category | Date |
|---|---|---|
| Uniform Combined State Law Examination | Series 66 | 04/19/1999 |

Additional information about the above exams or other exams FINRA administers to brokers and other securities professionals can be found at www.finra.org/brokerqualifications/registeredrep/.

©2017 FINRA. All rights reserved. Report about MICHAEL C. WARR.

www.finra.org/brokercheck



# Registration and Employment History

## Registration History

The broker previously was registered with the following firms:

| Registration Dates | Firm Name | CRD# | Branch Location |
|---|---|---|---|
| 04/2008 - 06/2009 | MORGAN STANLEY & CO. INCORPORATED | 8209 | TUSCALOOSA, AL |
| 04/1999 - 04/2008 | MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED | 7691 | TUSCALOOSA, AL |

## Employment History

This section provides up to 10 years of an individual broker's employment history as reported by the individual broker on the most recently filed Form U4.

**Please note that the broker is required to provide this information only while registered with FINRA or a national securities exchange and the information is not updated via Form U4 after the broker ceases to be registered. Therefore, an employment end date of "Present" may not reflect the broker's current employment status.**

| Employment Dates | Employer Name | Employer Location |
|---|---|---|
| 01/2015 - Present | MORGAN STANLEY PRIVATE BANK, NATIONAL ASSOCIAT | NEW YORK, NY |
| 06/2009 - Present | MORGAN STANLEY SMITH BARNEY | TUSCALOOSA, AL |
| 04/2008 - Present | MORGAN STANLEY & CO. INCORPORATED | TUSCALOOSA, AL |
| 02/1999 - 04/2008 | MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORA | TUSCALOOSA, AL |

## Other Business Activities

This section includes information, if any, as provided by the broker regarding other business activities the broker is currently engaged in either as a proprietor, partner, officer, director, employee, trustee, agent or otherwise. This section does not include non-investment related activity that is exclusively charitable, civic, religious or fraternal and is recognized as tax exempt.

NAME WACO, LLC
ADDRESS 6534 11TH COURT TUSCALOOSA, AL 35405
REAL ESTATE INVESTMENT
SILENT PARTNET
0 HOURS SPENT PER MONTH

©2017 FINRA. All rights reserved. Report about MICHAEL C. WARR.

www.finra.org/brokercheck



# Disclosure Events

**What you should know about reported disclosure events:**

1. All individuals registered to sell securities or provide investment advice are required to disclose customer complaints and arbitrations, regulatory actions, employment terminations, bankruptcy filings, and criminal or civil judicial proceedings.

2. **Certain thresholds must be met before an event is reported to CRD, for example:**
   - A law enforcement agency must file formal charges before a broker is required to disclose a particular criminal event.
   - A customer dispute must involve allegations that a broker engaged in activity that violates certain rules or conduct governing the industry and that the activity resulted in damages of at least $5,000.

3. **Disclosure events in BrokerCheck reports come from different sources:**
   - As mentioned at the beginning of this report, information contained in BrokerCheck comes from brokers, brokerage firms and regulators. When more than one of these sources reports information for the same disclosure event, all versions of the event will appear in the BrokerCheck report. The different versions will be separated by a solid line with the reporting source labeled.

4. **There are different statuses and dispositions for disclosure events:**
   - A disclosure event may have a status of *pending, on appeal,* or *final.*
     - A "pending" event involves allegations that have not been proven or formally adjudicated.
     - An event that is "on appeal" involves allegations that have been adjudicated but are currently being appealed.
     - A "final" event has been concluded and its resolution is not subject to change.
   - A final event generally has a disposition of *adjudicated, settled* or *otherwise resolved.*
     - An "adjudicated" matter includes a disposition by (1) a court of law in a criminal or civil matter, or (2) an administrative panel in an action brought by a regulator that is contested by the party charged with some alleged wrongdoing.
     - A "settled" matter generally involves an agreement by the parties to resolve the matter. Please note that brokers and brokerage firms may choose to settle customer disputes or regulatory matters for business or other reasons.
     - A "resolved" matter usually involves no payment to the customer and no finding of wrongdoing on the part of the individual broker. Such matters generally involve customer disputes.

**For your convenience, below is a matrix of the number and status of disclosure events involving this broker. Further information regarding these events can be found in the subsequent pages of this report. You also may wish to contact the broker to obtain further information regarding these events.**

|  | Pending | Final | On Appeal |
|---|---|---|---|
| Customer Dispute | 0 | 1 | N/A |

©2017 FINRA. All rights reserved. Report about MICHAEL C. WARR.



User Guidance

www.finra.org/brokercheck

©2017 FINRA. All rights reserved. Report about MICHAEL C. WARR.

www.finra.org/brokercheck



User Guidance

## Disclosure Event Details

When evaluating this information, please keep in mind that a disclosure event may be pending or involve allegations that are contested and have not been resolved or proven. The matter may, in the end, be withdrawn, dismissed, resolved in favor of the broker, or concluded through a negotiated settlement for certain business reasons (e.g., to maintain customer relationships or to limit the litigation costs associated with disputing the allegations) with no admission or finding of wrongdoing.

This report provides the information exactly as it was reported to CRD and therefore some of the specific data fields contained in the report may be blank if the information was not provided to CRD.

### Customer Dispute - Settled

This type of disclosure event involves a consumer-initiated, investment-related complaint, arbitration proceeding or civil suit containing allegations of sale practice violations against the broker that resulted in a monetary settlement to the customer.

**Disclosure 1 of 1**

| | |
|---|---|
| **Reporting Source:** | Broker |
| **Employing firm when activities occurred which led to the complaint:** | MORGAN STANLEY & CO. INCORPORATED |
| **Allegations:** | CLIENT ALLEGES MORGAN STANLEY WAS UNTIMELY IN ITS REALLOCATING OF HIS ANNUITY. DAMAGES UNSPECIFIED. |
| **Product Type:** | Other |
| **Other Product Type(s):** | ANNUITIES |
| **Alleged Damages:** | $0.00 |

### Customer Complaint Information

| | |
|---|---|
| **Date Complaint Received:** | 12/30/2008 |
| **Complaint Pending?** | No |
| **Status:** | Settled |
| **Status Date:** | 03/13/2009 |
| **Settlement Amount:** | $31,058.96 |
| **Individual Contribution Amount:** | $0.00 |

©2017 FINRA. All rights reserved. Report about MICHAEL C. WARR.

User Guidance

www.finra.org/brokercheck

©2017 FINRA. All rights reserved. Report about MICHAEL C. WARR.

FINLA

9

**End of Report**

**This page is intentionally left blank.**



# Individual Snapshot Report
Data current as of: 10/11/2017

## NOTICE

This report contains information from the Central Registration Depository (CRD®) and/or the Investment Adviser Registration Depository (IARD™), which are operated by the Financial Industry Regulatory Authority (FINRA®), a national securities association registered under the Securities Exchange Act of 1934. The CRD system primarily contains information submitted on uniform broker-dealer and agent registration forms and certain other information related to registration and licensing. The IARD system primarily contains information submitted on uniform investment adviser and agent registration forms and certain other information related to registration and licensing.

FINRA operates the CRD system in its capacity as a registered national securities association and pursuant to an agreement with the North American Securities Administrators Association, Inc. (NASAA).

FINRA operates the IARD system as a vendor pursuant to a contact with the Securities and Exchange Commission and undertakings with NASAA and participating state regulators.

| | |
|---|---|
| Individual CRD# | 3187674 |
| Full Legal Name | WARR, MICHAEL CHARLES |
| Other Names Known By | WARR, MICHAEL C |
| State of Residence | Alabama |
| Do you have disclosure? | Yes |
| Are you subject to Statutory Disqualification? | No |

## Residential History

| From | To | Street | City | State/Country | Zip |
|---|---|---|---|---|---|
| 04/01/2017 | PRESENT | 1116 PINEMONT DRIVE N | TUSCALOOSA | AL | 35406 |
| 06/01/2012 | 04/2017 | 1322 INDIAN HILLS DR | TUSCALOOSA | AL | 35406 |
| 12/01/2009 | 06/2012 | 3535 GRAND ARBOR DRIVE | TUSCALOOSA | AL | 35406 |
| 11/01/2009 | 12/2009 | 1322 INDIAN HILLS DR. | TUSCALOOSA | AL | 35406 |
| 04/01/2009 | 11/2009 | 15008 WATERCREST DRIVE | NORTHPORT | AL | 35475 |
| 01/01/2008 | 04/2009 | 705 GREENBRIAR BLVD | NORTHPORT | AL | 35473 |
| 01/01/2007 | 12/2007 | 1322 INDIAN HILLS DR | TUSCALOOSA | AL | 35406 |
| 08/01/2003 | 01/2007 | 404 VANTAGE POINT | TUSCALOOSA | AL | 35406 |
| 10/01/2002 | 08/2003 | 404 VANTAGE POINT | TUSCALOOSA | AL | 35406 |
| 07/01/2001 | 10/2002 | 60 THE DOWNS | TUSCALOOSA | AL | 35401 |
| 09/01/1996 | 07/2001 | 1093 FAIRFAX DRIVE | TUSCALOOSA | AL | 35406 |
| 08/01/1993 | 09/1996 | SIGMA NU FRATERNITY | TUSCALOOSA | AL | 35401 |

## Registrations with Current Employer(s)

| Firm Name | Firm CRD Number | Employment Start Date | Employment End Date |
|---|---|---|---|
| MORGAN STANLEY | 149777 | 06/01/2009 | Present |

| Firm Name | Firm CRD Number | | Employment Start Date | | Employment End Date |
|---|---|---|---|---|---|
| Regulator | Registration Category | Status Date | Registration Status | Approval Date | |
| FINRA | GS | 06/01/2009 | APPROVED | 06/01/2009 | |
| FINRA | SU | 06/01/2009 | APPROVED | 06/01/2009 | |
| NQX | GS | 06/01/2009 | APPROVED | 06/01/2009 | |
| NQX | SU | 06/01/2009 | APPROVED | 06/01/2009 | |
| NYSE | BM | 06/01/2009 | APPROVED | 06/01/2009 | |
| NYSE | GS | 06/01/2009 | APPROVED | 06/01/2009 | |
| NYSE-AMER | BM | 06/17/2011 | APPROVED | 06/17/2011 | |
| NYSE-AMER | GS | 06/17/2011 | APPROVED | 06/17/2011 | |
| AL | AG | 06/01/2009 | APPROVED | 06/01/2009 | |
| AL | RA | 06/01/2009 | APPROVED | 06/01/2009 | |
| AR | AG | 06/01/2009 | APPROVED | 06/01/2009 | |
| AZ | AG | 12/31/2016 | TERMED | 05/26/2016 | |
| CA | AG | 06/01/2009 | APPROVED | 06/01/2009 | |
| CO | AG | 01/18/2017 | APPROVED | 01/18/2017 | |
| CO | AG | 12/31/2010 | TERMED | 06/01/2009 | |
| CT | AG | 06/04/2015 | APPROVED | 06/04/2015 | |
| DC | AG | 12/31/2012 | TERMED | 06/01/2009 | |
| DE | AG | 06/01/2009 | APPROVED | 06/01/2009 | |
| FL | AG | 07/14/2009 | APPROVED | 07/14/2009 | |
| GA | AG | 06/01/2009 | APPROVED | 06/01/2009 | |
| HI | AG | 05/18/2016 | T_NOREG | | |
| IL | AG | 12/31/2012 | TERMED | 06/01/2009 | |
| KS | AG | 12/31/2012 | TERMED | 01/13/2012 | |
| KY | AG | 07/26/2017 | APPROVED | 07/26/2017 | |
| KY | AG | 12/31/2013 | TERMED | 06/01/2009 | |
| LA | AG | 06/01/2009 | APPROVED | 06/01/2009 | |
| MA | AG | 05/14/2010 | APPROVED | 05/14/2010 | |
| MD | AG | 12/31/2012 | TERMED | 06/01/2009 | |
| MI | AG | 06/01/2009 | APPROVED | 06/01/2009 | |
| MO | AG | 12/31/2015 | TERMED | 06/01/2009 | |
| MS | AG | 06/01/2009 | APPROVED | 06/01/2009 | |
| NC | AG | 06/01/2009 | APPROVED | 06/01/2009 | |
| NJ | AG | 03/29/2016 | APPROVED | 03/29/2016 | |
| NJ | AG | 12/31/2014 | TERMED | 07/23/2012 | |
| NJ | AG | 12/31/2010 | TERMED | 06/01/2009 | |
| NM | AG | 12/31/2016 | TERMED | 04/27/2016 | |
| NV | AG | 12/31/2012 | TERMED | 02/08/2012 | |
| NV | AG | 12/31/2010 | TERMED | 06/01/2009 | |
| NY | AG | 04/09/2013 | APPROVED | 04/09/2013 | |
| NY | AG | 12/31/2011 | TERMED | 06/01/2009 | |
| OH | AG | 12/31/2016 | TERMED | 08/02/2013 | |
| OH | AG | 12/31/2012 | TERMED | 06/01/2009 | |
| OK | AG | 12/31/2012 | TERMED | 06/01/2009 | |
| OR | AG | 12/31/2014 | TERMED | 06/01/2009 | |
| PA | AG | 04/08/2016 | APPROVED | 04/08/2016 | |
| SC | AG | 06/01/2009 | APPROVED | 06/01/2009 | |
| TN | AG | 06/01/2009 | APPROVED | 06/01/2009 | |
| TX | AG | 06/01/2009 | APPROVED | 06/01/2009 | |
| TX | RA | 06/01/2009 | APPROVED | 06/01/2009 | |
| VA | AG | 10/22/2013 | APPROVED | 10/22/2013 | |
| VA | AG | 12/31/2012 | TERMED | 06/01/2009 | |
| WA | AG | 09/28/2015 | APPROVED | 09/28/2015 | |
| WV | AG | 09/20/2017 | APPROVED | 09/20/2017 | |

**Registrations with Previous Employer(s)**

| Firm Name | Firm CRD Number | Employment Start Date | Employment End Date | Reason For Termination | Termination Comment |
|---|---|---|---|---|---|
| MORGAN STANLEY & CO. INCORPORATED | 8209 | 04/23/2008 | 06/01/2009 | OTHER | REGISTERED REPRESENTATIVE WAS CONTRIBUTED TO NEW JOINT VENTURE BROKER-DEALER, MORGAN STANLEY SMITH BARNEY |

Individual Information

| Firm Name | Firm CRD Number | Employment Start Date | Employment End Date | Reason For Termination | Termination Comment |
|---|---|---|---|---|---|

| Regulator | Registration Category | Status Date | Registration Status | Approval Date |
|---|---|---|---|---|
| BX | GS | 06/01/2009 | T_NOMT | 01/16/2009 |
| BX | SU | 06/01/2009 | T_NOMT | 01/16/2009 |
| CBOE | GS | 06/01/2009 | T_NOMT | 04/23/2008 |
| CBOE | SU | 06/01/2009 | T_NOMT | 04/23/2008 |
| FINRA | GS | 06/01/2009 | MASS_TRNSF | 04/23/2008 |
| FINRA | SU | 06/01/2009 | MASS_TRNSF | 04/23/2008 |
| ISE | GS | 06/01/2009 | T_NOMT | 04/23/2008 |
| NQX | GS | 06/01/2009 | MASS_TRNSF | 04/23/2008 |
| NQX | SU | 06/01/2009 | MASS_TRNSF | 04/23/2008 |
| NYSE | BM | 06/01/2009 | MASS_TRNSF | 04/23/2008 |
| NYSE | GS | 06/01/2009 | MASS_TRNSF | 04/23/2008 |
| NYSE-AMER | BM | 06/01/2009 | T_NOMT | 04/23/2008 |
| NYSE-AMER | GS | 06/01/2009 | T_NOMT | 04/23/2008 |
| NYSE-ARCA | GS | 06/01/2009 | T_NOMT | 04/23/2008 |
| NYSE-ARCA | SU | 06/01/2009 | T_NOMT | 04/23/2008 |
| PHLX | GS | 06/01/2009 | T_NOMT | 04/23/2008 |
| PHLX | SU | 06/01/2009 | T_NOMT | 04/23/2008 |
| AL | AG | 06/01/2009 | MASS_TRNSF | 04/23/2008 |
| AL | RA | 06/01/2009 | MASS_TRNSF | 04/23/2008 |
| AR | AG | 06/01/2009 | MASS_TRNSF | 07/24/2008 |
| CA | AG | 06/01/2009 | MASS_TRNSF | 04/23/2008 |
| CO | AG | 06/01/2009 | MASS_TRNSF | 04/23/2008 |
| DC | AG | 06/01/2009 | MASS_TRNSF | 12/01/2008 |
| DE | AG | 06/01/2009 | MASS_TRNSF | 10/21/2008 |
| FL | AG | 06/11/2009 | TERMED | 04/23/2008 |
| GA | AG | 06/01/2009 | MASS_TRNSF | 04/23/2008 |
| IL | AG | 06/01/2009 | MASS_TRNSF | 02/25/2009 |
| KY | AG | 06/01/2009 | MASS_TRNSF | 04/23/2008 |
| LA | AG | 06/01/2009 | MASS_TRNSF | 04/23/2008 |
| MD | AG | 06/01/2009 | MASS_TRNSF | 07/24/2008 |
| MI | AG | 06/01/2009 | MASS_TRNSF | 04/23/2008 |
| MO | AG | 06/01/2009 | MASS_TRNSF | 04/23/2008 |
| MS | AG | 06/01/2009 | MASS_TRNSF | 04/23/2008 |
| NC | AG | 06/01/2009 | MASS_TRNSF | 04/23/2008 |
| NJ | AG | 06/01/2009 | MASS_TRNSF | 06/05/2008 |
| NV | AG | 06/01/2009 | MASS_TRNSF | 04/23/2008 |
| NY | AG | 06/01/2009 | MASS_TRNSF | 07/01/2008 |
| OH | AG | 06/01/2009 | MASS_TRNSF | 07/25/2008 |
| OK | AG | 06/01/2009 | MASS_TRNSF | 07/24/2008 |
| OR | AG | 06/01/2009 | MASS_TRNSF | 07/24/2008 |
| SC | AG | 06/01/2009 | MASS_TRNSF | 04/23/2008 |
| TN | AG | 06/01/2009 | MASS_TRNSF | 04/23/2008 |
| TX | AG | 06/01/2009 | MASS_TRNSF | 04/23/2008 |
| TX | RA | 06/01/2009 | MASS_TRNSF | 04/23/2008 |
| VA | AG | 06/01/2009 | MASS_TRNSF | 07/24/2008 |

| Firm Name | Firm CRD Number | Employment Start Date | Employment End Date | Reason For Termination | Termination Comment |
|---|---|---|---|---|---|
| MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED | 7691 | 02/01/1999 | 04/23/2008 | VOLUNTARY | |

Individual Information

| Firm Name | Firm CRD Number | Employment Start Date | Employment End Date | Reason For Termination | Termination Comment |
|-----------|-----------------|----------------------|---------------------|------------------------|---------------------|
| | | | | | |

| Regulator | Registration Category | Status Date | Registration Status | Approval Date |
|-----------|----------------------|-------------|---------------------|---------------|
| CBOE | GS | 04/26/2008 | TERMED | 04/08/1999 |
| CBOE | SU | 04/26/2008 | TERMED | 07/15/2004 |
| FINRA | GS | 04/26/2008 | TERMED | 04/08/1999 |
| FINRA | SU | 04/26/2008 | TERMED | 07/09/2004 |
| ISE | GS | 04/26/2008 | TERMED | 01/26/2008 |
| NQX | GS | 04/26/2008 | TERMED | 07/12/2006 |
| NQX | SU | 04/26/2008 | TERMED | 07/12/2006 |
| NYSE | BM | 04/26/2008 | TERMED | 07/15/2004 |
| NYSE | GS | 04/26/2008 | TERMED | 06/01/1999 |
| NYSE-AMER | BM | 04/26/2008 | TERMED | 07/15/2004 |
| NYSE-AMER | GS | 04/26/2008 | TERMED | 06/01/1999 |
| NYSE-ARCA | GS | 04/26/2008 | TERMED | 04/08/1999 |
| NYSE-ARCA | SU | 04/26/2008 | TERMED | 07/15/2004 |
| PHLX | GS | 04/26/2008 | TERMED | 04/08/1999 |
| PHLX | SU | 04/26/2008 | TERMED | 07/15/2004 |
| AL | AG | 04/26/2008 | TERMED | 04/20/1999 |
| AL | RA | 04/26/2008 | TERMED | 05/07/1999 |
| AR | AG | 12/31/2007 | TERMED | 08/02/2006 |
| AZ | AG | 12/31/2004 | TERMED | 01/19/2001 |
| CA | AG | 04/26/2008 | TERMED | 10/27/2000 |
| CO | AG | 04/26/2008 | TERMED | 03/30/2006 |
| CO | AG | 12/31/2001 | TERMED | 01/19/2001 |
| DC | AG | 12/31/2001 | TERMED | 02/03/2000 |
| FL | AG | 04/26/2008 | TERMED | 05/30/2000 |
| GA | AG | 04/26/2008 | TERMED | 06/10/1999 |
| IL | AG | 12/31/2001 | TERMED | 01/19/2001 |
| KY | AG | 04/26/2008 | TERMED | 02/07/2007 |
| LA | AG | 04/26/2008 | TERMED | 07/23/2007 |
| LA | AG | 12/31/2004 | TERMED | 02/17/2000 |
| MD | AG | 12/31/2001 | TERMED | 01/19/2001 |
| MI | AG | 04/26/2008 | TERMED | 01/06/2004 |
| MS | AG | 04/26/2008 | TERMED | 01/19/2001 |
| NC | AG | 04/26/2008 | TERMED | 06/19/2000 |
| NE | AG | 12/31/2001 | TERMED | 01/19/2001 |
| NV | AG | 12/31/2006 | TERMED | 01/11/2005 |
| NV | AG | 12/31/2004 | TERMED | 04/13/2004 |
| NY | AG | 12/31/2006 | TERMED | 04/13/2004 |
| NY | AG | 12/31/2001 | TERMED | 01/19/2001 |
| OK | AG | 12/31/2001 | TERMED | 01/22/2001 |
| OR | AG | 12/31/2001 | TERMED | 02/20/2004 |
| PA | AG | 12/31/2001 | TERMED | 05/30/2000 |
| SC | AG | 04/26/2008 | TERMED | 02/24/2006 |
| SC | AG | 12/31/2005 | TERMED | 12/09/2004 |
| TN | AG | 04/26/2008 | TERMED | 01/19/2001 |
| TX | AG | 04/26/2008 | TERMED | 06/01/2007 |
| TX | AG | 12/31/2004 | TERMED | 01/19/2001 |
| TX | RA | 04/26/2008 | TERMED | 06/11/2007 |
| TX | RA | 01/29/2005 | TERMED | 01/19/2001 |
| VA | AG | 12/31/2006 | TERMED | 05/24/2002 |
| WA | AG | 12/31/2007 | TERMED | 09/20/2005 |
| WI | AG | 12/31/2001 | TERMED | 01/19/2001 |

## Professional Designations

No Designations

## Employment History

### Office of Employment Address History

| Employment Start Date | Employment End Date | Firm Name | Independent Contractor | CRD Branch# | Branch Code# | Firm Billing Code | Registered Location? | Private Residence? | Type Of Office | Address |
|-----------------------|---------------------|-----------|------------------------|-------------|--------------|-------------------|----------------------|--------------------|----------------|---------|
| 06/01/2009 | Present | MORGAN STANLEY (149777) | No | 408483 | 100743 | 100743 | Yes | No | Located At | 1657 NORTH MCFARLAND BLVD. SUITE G3E TUSCALOOSA, AL 35406 United States |
| 06/01/2009 | 06/01/2009 | MORGAN STANLEY & CO. INCORPORATED (8209) | No | BD MAIN | 1585-MAIN | | No | No | Located At | 1585 BROADWAY NEW YORK, NY 10036-8293 UNITED STATES |

Individual Information

| Employment Start Date | Employment End Date | Firm Name | Independent Contractor | CRD Branch# | Branch Code# | Firm Billing Code | Registered Location? | Private Residence? | Type Of Office | Address |
|---|---|---|---|---|---|---|---|---|---|---|
| 04/23/2008 | 06/01/2009 | MORGAN STANLEY & CO. INCORPORATED (8209) | No | 366503 | 100743 | 100743 | Yes | No | Located At | 1657 NORTH MCFARLAND BLVD. SUITE G3E TUSCALOOSA, AL 35406 United States |
| 02/01/1999 | 04/23/2008 | MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED (7691) | No | 92782 | 050-526 | 050-526 | Yes | No | Located At | 302 MERCHANT'S WALK SUITE 100 TUSCALOOSA, AL 35406 United States |

### U4 Employment History

| Employment Start Date | Employment End Date | Name | Location | Position | Investment Related |
|---|---|---|---|---|---|
| 01/2015 | PRESENT | MORGAN STANLEY PRIVATE BANK, NATIONAL ASSOCIATION | NEW YORK, NY United States | FINANCIAL ADVISOR | Yes |
| 06/2009 | PRESENT | MORGAN STANLEY SMITH BARNEY | TUSCALOOSA, AL United States | Mass Transfer | Yes |
| 04/2008 | PRESENT | MORGAN STANLEY & CO. INCORPORATED | TUSCALOOSA, AL United States | FINANCIAL ADVISOR & BRANCH MANAGER | Yes |
| 02/1999 | 04/2008 | MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED | TUSCALOOSA, AL United States | NOT PROVIDED | Yes |
| 05/1997 | 01/1999 | TUSCALOOSA TEACHERS CREDIT UNION | TUSCALOOSA, AL United States | OTHER - LOAN COUNSELOR | No |
| 03/1997 | 05/1997 | UNEMPLOYED | TUSCALOOSA, AL United States | OTHER - 1093 FAIRFAX DRIVE, TUSCALOOSA | No |
| 08/1996 | 03/1997 | REGIONS BANK | TUSCALOOSA, AL United States | OTHER - TRAINING FACILITATO | No |
| 05/1996 | 08/1996 | UNEMPLOYED | TUSCALOOSA, AL United States | OTHER - SIGMA NU FRATERNITY TUSCALOOSA | No |
| 08/1991 | 05/1996 | FULL TIME STUDENT | TUSCALOOSA, AL United States | OTHER - U. OF ALABAMA | No |
| 08/1988 | 05/1991 | FULL TIME STUDENT | BUTLER, AL United States | OTHER - PATRICIAN ACADEMY ROUTE 1 SAW | No |

### Other Business

| Other Business | NAME WACO, LLC ADDRESS 6534 11TH COURT TUSCALOOSA, AL 35405 REAL ESTATE INVESTMENT SILENT PARTNET 0 HOURS SPENT PER MONTH |
|---|---|

### Exam Information

#### Exam History

| Exam | Enrollment ID | Exam Status | Status Date | Exam Date | Grade | Score | Window Begin Date | Window End Date |
|---|---|---|---|---|---|---|---|---|
| S7 | 23122272 | Official Result | 04/07/1999 | 04/07/1999 | Passed | 87 | | |
| S9 | 23122273 | Official Result | 06/28/2004 | 06/26/2004 | Passed | 74 | 06/03/2004 | 10/01/2004 |
| S10 | 23122266 | Official Result | 07/09/2004 | 07/08/2004 | Passed | 78 | 06/03/2004 | 10/01/2004 |
| S31 | 23122269 | Official Result | 08/13/2004 | 08/12/2004 | Passed | 82 | 08/04/2004 | 12/02/2004 |
| | 23122268 | Window Expired | 07/05/2004 | | | | 03/04/2004 | 07/02/2004 |
| | 23122267 | Window Expired | 01/01/2004 | | | | 09/02/2003 | 12/31/2003 |
| S63 | 23122270 | Window Expired | 05/24/1999 | | | 0 | | |
| S66 | 23122271 | Official Result | 04/19/1999 | 04/19/1999 | Passed | 78 | | |

### Exam Appointments

No Exam Appointments

### Continuing Education

#### Individual CE Information

| Current CE Status | SATISFIED |
|---|---|
| CE Base Date | 04/08/1999 |

### Current CE Appointments

No Current CE Appointments

### Current CE Requirements

## Next CE

| Window Dates | Enrollment ID | Requirement Type |
|---|---|---|
| 04/08/2019 - 08/05/2019 | 35531291 | Anniversary |

## Inactive CE History

No CE Inactive History

## U4 - Disclosure Questions

IF THE ANSWER TO ANY OF THE FOLLOWING QUESTIONS IS 'YES', COMPLETE DETAILS OF ALL EVENTS OR PROCEEDINGS ON APPROPRIATE DRP(S)

REFER TO THE EXPLANATION OF TERMS SECTION OF FORM U4 INSTRUCTIONS FOR EXPLANATIONS OF ITALICIZED TERMS.

### Criminal Disclosure

|  |  | Yes | No |
|---|---|:---:|:---:|
| 14A. (1) | Have you ever: | | |
| | (a) been convicted of or pled guilty or nolo contendere ("no contest") in a domestic, foreign, or military court to any *felony*? | ○ | ◉ |
| | (b) been *charged* with any *felony*? | ○ | ◉ |
| (2) | Based upon activities that occurred while you exercised *control* over it, has an organization ever: | | |
| | (a) been convicted of or pled guilty or nolo contendere ("no contest") in a domestic or foreign court to any *felony*? | ○ | ◉ |
| | (b) been *charged* with any *felony*? | ○ | ◉ |
| 14B. (1) | Have you ever: | | |
| | (a) been convicted of or pled guilty or nolo contendere ("no contest") in a domestic, foreign or military court to a *misdemeanor involving:* investments or an *investment-related* business or any fraud, false statements or omissions, wrongful taking of property, bribery, perjury, forgery, counterfeiting, extortion, or a conspiracy to commit any of these offenses? | ○ | ◉ |
| | (b) been *charged* with a *misdemeanor* specified in 14B(1)(a)? | ○ | ◉ |
| (2) | Based upon activities that occurred while you exercised *control* over it, has an organization ever: | | |
| | (a) been convicted of or pled guilty or nolo contendere ("no contest") in a domestic or foreign court to a *misdemeanor* specified in 14B(1)(a)? | ○ | ◉ |
| | (b) been *charged* with a *misdemeanor* specified in 14B(1)(a)? | ○ | ◉ |

### Regulatory Action Disclosure

|  |  | Yes | No |
|---|---|:---:|:---:|
| 14C. | Has the U.S. Securities and Exchange Commission or the Commodity Futures Trading Commission ever: | | |
| | (1) *found* you to have made a false statement or omission? | ○ | ◉ |
| | (2) *found* you to have been *involved* in a violation of its regulations or statutes? | ○ | ◉ |
| | (3) *found* you to have been a cause of an *investment-related* business having its authorization to do business denied, suspended, revoked, or restricted? | ○ | ◉ |
| | (4) entered an *order* against you in connection with *investment-related* activity? | ○ | ◉ |
| | (5) imposed a civil money penalty on you, or *ordered* you to cease and desist from any activity? | ○ | ◉ |
| | (6) *found* you to have willfully violated any provision of the Securities Act of 1933, the Securities Exchange Act of 1934, the Investment Advisers Act of 1940, the Investment Company Act of 1940, the Commodity Exchange Act, or any rule or regulation under any of such Acts, or any of the rules of the Municipal Securities Rulemaking Board, or *found* you to have been unable to comply with any provision of such Act, rule or regulation? | ○ | ◉ |
| | (7) *found* you to have willfully aided, abetted, counseled, commanded, induced, or procured the violation by any person of any provision of the Securities Act of 1933, the Securities Exchange Act of 1934, the Investment Advisers Act of 1940, the Investment Company Act of 1940, the Commodity Exchange Act, or any rule or regulation under any of such Acts, or any of the rules of the Municipal Securities Rulemaking Board? | ○ | ◉ |
| | (8) *found* you to have failed reasonably to supervise another person subject to your supervision, with a view to preventing the violation of any provision of the Securities Act of 1933, the Securities Exchange Act of 1934, the Investment Advisers Act of 1940, the Investment Company Act of 1940, the Commodity Exchange Act, or any rule or regulation under any of such Acts, or any of the rules of the Municipal Securities Rulemaking Board? | ○ | ◉ |
| 14D. (1) | Has any other Federal regulatory agency or any state regulatory agency or *foreign financial regulatory authority* ever: | | |
| | (a) *found* you to have made a false statement or omission or been dishonest, unfair or unethical? | ○ | ◉ |
| | (b) *found* you to have been *involved* in a violation of *investment-related* regulation(s) or statute(s)? | ○ | ◉ |
| | (c) *found* you to have been a cause of an *investment-related* business having its authorization to do business denied, suspended, revoked or restricted? | ○ | ◉ |
| | (d) entered an *order* against you in connection with an *investment-related* activity? | ○ | ◉ |
| | (e) denied, suspended, or revoked your registration or license or otherwise, by *order*, prevented you from associating with an *investment-related* business or restricted your activities? | ○ | ◉ |
| (2) | Have you been subject to any *final order* of a state securities commission (or any agency or officer performing like functions), state authority that supervises or examines banks, savings associations, or credit unions, state insurance commission (or any agency or office performing like functions), an appropriate *federal banking agency*, or the National Credit Union Administration, that: | | |
| | (a) bars you from association with an entity regulated by such commission, authority, agency, or officer, or from engaging in the business of securities, insurance, banking, savings association activities, or credit union activities: or | ○ | ◉ |
| | (b) constitutes a *final order* based on violations of any laws or regulations that prohibit fraudulent, manipulative, or deceptive conduct? | ○ | ◉ |

| | | Yes | No |
|---|---|---|---|
| **14E.** | **Has any _self-regulatory organization_ ever:** | | |
| (1) | _found_ you to have made a false statement or omission? | ○ | ⊙ |
| (2) | _found_ you to have been _involved_ in a violation of its rules (other than a violation designated as a "_minor rule violation_" under a plan approved by the U.S. Securities and Exchange Commission)? | ○ | ⊙ |
| (3) | _found_ you to have been the cause of an _investment-related_ business having its authorization to do business denied, suspended, revoked or restricted? | ○ | ⊙ |
| (4) | disciplined you by expelling or suspending you from membership, barring or suspending your association with its members, or restricting your activities? | ○ | ⊙ |
| (5) | _found_ you to have willfully violated any provision of the Securities Act of 1933, the Securities Exchange Act of 1934, the Investment Advisers Act of 1940, the Investment Company Act of 1940, the Commodity Exchange Act, or any rule or regulation under any of such Acts, or any of the rules of the Municipal Securities Rulemaking Board, or _found_ you to have been unable to comply with any provision of such Act, rule or regulation? | ○ | ⊙ |
| (6) | _found_ you to have willfully aided, abetted, counseled, commanded, induced, or procured the violation by any person of any provision of the Securities Act of 1933, the Securities Exchange Act of 1934, the Investment Advisers Act of 1940, the Investment Company Act of 1940, the Commodity Exchange Act, or any rule or regulation under any of such Acts, or any of the rules of the Municipal Securities Rulemaking Board? | ○ | ⊙ |
| (7) | _found_ you to have failed reasonably to supervise another person subject to your supervision, with a view to preventing the violation of any provision of the Securities Act of 1933, the Securities Exchange Act of 1934, the Investment Advisers Act of 1940, the Investment Company Act of 1940, the Commodity Exchange Act, or any rule or regulation under any of such Acts, or any of the rules of the Municipal Securities Rulemaking Board? | ○ | ⊙ |
| **14F.** | **Have you ever had an authorization to act as an attorney, accountant or federal contractor that was revoked or suspended?** | ○ | ⊙ |

| | | Yes | No |
|---|---|---|---|
| **14G.** | **Have you been notified, in writing, that you are now the subject of any:** | | |
| (1) | regulatory complaint or _proceeding_ that could result in a "yes" answer to any part of 14C, D or E? (If "yes", complete the _Regulatory Action_ Disclosure Reporting Page.) | ○ | ⊙ |
| (2) | _investigation_ that could result in a "yes" answer to any part of 14A, B, C, D or E? (If "yes", complete the _Investigation_ Disclosure Reporting Page.) | ○ | ⊙ |

**Civil Judicial Disclosure**

| | | Yes | No |
|---|---|---|---|
| **14H. (1)** | **Has any domestic or foreign court ever:** | | |
| (a) | _enjoined_ you in connection with any _investment-related_ activity? | ○ | ⊙ |
| (b) | _found_ that you were _involved_ in a violation of any _investment-related_ statute(s) or regulation(s)? | ○ | ⊙ |
| (c) | dismissed, pursuant to a settlement agreement, an _investment-related_ civil action brought against you by a state or _foreign financial regulatory authority_? | ○ | ⊙ |
| **(2)** | **Are you named in any pending _investment-related_ civil action that could result in a "yes" answer to any part of 14H(1)?** | ○ | ⊙ |

**Customer Complaint/Arbitration/Civil Litigation Disclosure**

| | | Yes | No |
|---|---|---|---|
| **14I. (1)** | **Have you ever been named as a respondent/defendant in an _investment-related_, consumer-initiated arbitration or civil litigation which alleged that you were _involved_ in one or more _sales practice violations_ and which:** | | |
| (a) | is still pending, or: | ○ | ⊙ |
| (b) | resulted in an arbitration award or civil judgment against you, regardless of amount, or: | ○ | ⊙ |
| (c) | was settled, prior to 05/18/2009, for an amount of $10,000 or more, or: | ○ | ⊙ |
| (d) | was settled, on or after 05/18/2009, for an amount of $15,000 or more? | ○ | ⊙ |
| **(2)** | **Have you ever been the subject of an _investment-related_, consumer-initiated (written or oral) complaint, which alleged that you were _involved_ in one or more _sales practice violations_, and which:** | | |
| (a) | was settled, prior to 05/18/2009 for an amount of $10,000 or more, or: | ⊙ | ○ |
| (b) | was settled, on or after 05/18/2009, for an amount of $15,000 or more? | ○ | ⊙ |
| **(3)** | **Within the past twenty four (24) months, have you been the subject of an _investment-related_, consumer-initiated, written complaint, not otherwise reported under question 14I (2) above, which:** | | |
| (a) | alleged that you were _involved_ in one or more _sales practice violations_ and contained a claim for compensatory damages of $5,000 or more (if no damage amount is alleged, the complaint must be reported unless the _firm_ has made a good faith determination that the damages from the alleged conduct would be less than $5,000), or: | ○ | ⊙ |
| (b) | alleged that you were _involved_ in forgery, theft, misappropriation or conversion of funds or securities? | ○ | ⊙ |
| | **Answer questions (4) and (5) below only for arbitration claims or civil litigation filed on or after 05/18/2009.** | | |
| **(4)** | **Have you ever been the subject of an _investment-related_, consumer-initiated arbitration claim or civil litigation which alleged that you were _involved_ in one or more _sales practice violations_, and which:** | | |
| (a) | was settled for an amount of $15,000 or more, or: | ○ | ⊙ |
| (b) | resulted in an arbitration award or civil judgment against any named respondent(s)/defendant(s), regardless of any amount? | ○ | ⊙ |
| **(5)** | **Within the past twenty four (24) months, have you been the subject of an _investment-related_, consumer-initiated arbitration claim or civil litigation not otherwise reported under questions 14I(4) above, which:** | | |
| (a) | alleged that you were _involved_ in one or more _sales practice violations_ and contained a claim for compensatory damages of $5,000 or more (if no damage amount is alleged, the arbitration claim or civil litigation, must be reported unless the _firm_ has made a good faith determination that the damages from the alleged conduct would be less than $5,000), or: | ○ | ⊙ |
| (b) | alleged that you were _involved_ in forgery, theft, misappropriation or conversion of funds or securities? | ○ | ⊙ |

**Termination Disclosure**

| | | Yes | No |
|---|---|---|---|
| **14J.** | **Have you ever voluntarily _resigned_, been discharged or permitted to _resign_ after allegations were made that accused you of:** | | |
| (1) | violating _investment-related_ statutes, regulations, rules, or industry standards of conduct? | | |

|  | Yes | No |
|---|---|---|
| (2) fraud or the wrongful taking of property? | ○ | ◉ |
| (3) failure to supervise in connection with *investment-related* statutes, regulations, rules or industry standards of conduct? | ○ | ◉ |

**Financial Disclosure**

**14K.  Within the past 10 years:**

|  | Yes | No |
|---|---|---|
| (1) have you made a compromise with creditors, filed a bankruptcy petition or been the subject of an involuntary bankruptcy petition? | ○ | ◉ |
| (2) based upon events that occurred while you exercised *control* over it, has an organization made a compromise with creditors, filed a bankruptcy petition or been the subject of an involuntary bankruptcy petition? | ○ | ◉ |
| (3) based upon events that occurred while you exercised *control* over it, has a broker or dealer been the subject of an involuntary bankruptcy petition, or had a trustee appointed, or had a direct payment procedure initiated under the Securities Investor Protection Act? | ○ | ◉ |

**14L.  Has a bonding company ever denied, paid out on, or revoked a bond for you?**　　　　　　　○　◉

**14M.  Do you have any unsatisfied judgments or liens against you?**　　　　　　　○　◉

---

**Current Disclosure**

**Current Disclosure Counts**

| Bankruptcy | 0 |
|---|---|
| Bond | 0 |
| Civil Judicial | 0 |
| Criminal | 0 |
| Customer Complaint | 1 |
| Internal Review | 0 |
| Investigation | 0 |
| Judgment/Lien | 0 |
| Regulatory Action | 0 |
| Termination | 0 |

---

**Current Disclosure Events**

**Customer Complaint (Occurrence#: 1451227)**

**U4 - AMENDMENT**
**04/09/2009**
**MORGAN STANLEY & CO. LLC (8209)**

Rev. Form U4 (10/2005)

This Disclosure Reporting Page is an ◉ INITIAL OR ○ AMENDED  response to report details for affirmative response to *Question 14I* on Form U4:

**Check question(s) you are responding to:**

**Customer Complaint/Arbitration/Civil Litigation**　　Rev. DRP (10/2005)

☐ 14I (1) (a)　　☐ 14I (1) (b)　　☐ 14I (1) (c)　　☑ 14I (2)　　☐ 14I (3) (a)　　☐ 14I (3) (b)

One event may result in more than one affirmative answer to the above items. Use only one DRP to report details related to one customer complaint/arbitration/civil litigation. Use a separate DRP for each customer complaint/arbitration/civil litigation.

DRP Instructions:

- In all matters (i.e., customer complaints, arbitrations/CFTC reparations, civil litigations), complete items 1-6.
- If the matter involves only a customer complaint, also complete items 7-12, as appropriate.
- If the customer complaint has evolved into an arbitration/CFTC reparation or civil litigation, amend the existing DRP by completing items 9 and 10.
- If the matter involves an arbitration or CFTC reparation, complete items 13-19, as appropriate.
- If the matter involves a civil litigation, complete items 20-27.
- Item 28 is an optional field and applies to all event types (i.e., customer complaint, arbitration/CFTC reparation, civil litigation).

Complete items 1-6 for all events.

1.　Customer Name(s):
　　JOHN E. JARVIS

2.　Customer(s) State of Residence:
　　Alabama
　　Other state(s) of residence/detail:

3.　Employing Firm when activities occurred which led to the complaint:
　　MORGAN STANLEY & CO. INCORPORATED

4.　Allegation(s) and a brief summary of events related to the allegation(s) including dates when activities leading to the allegation(s) occurred:
　　CLIENT ALLEGES MORGAN STANLEY WAS UNTIMELY IN ITS REALLOCATING OF HIS ANNUITY. DAMAGES UNSPECIFIED.

5.　Principal Product Type:
　　Other
　　Other Product Types:
　　ANNUITIES

6. Alleged Compensatory Damage Amount:
$ 0.00

**If the matter involves only a customer complaint, complete items 7-12, as appropriate.**

7. Date Customer Complaint was received(MM/DD/YYYY):
12/30/2008  ○ Exact  ● Explanation
If not exact, provide explanation:
THIS WAS AN ORAL COMPLAINT

8. Is the customer complaint pending?  ○ Yes ● No

**If the customer complaint has evolved into an arbitration/CFTC reparation or civil litigation, amend the existing DRP by completing items 9 and 10.**

9. If the customer complaint is not pending, provide status:
If status is settlement, complete items 11 and 12;
If status is arbitration/reparation, complete items 13-19;
If status is litigation, complete items 20-27.
☐ Closed/No Action          ☐ Withdrawn          ☐ Denied
☑ Settled                   ☐ Arbitration/Reparation   ☐ Litigation

10. Status Date (MM/DD/YYYY):
03/13/2009 ● Exact ○ Explanation
If not exact, provide explanation:

11. Settlement Amount (if settled without arbitration, litigation or reparation):
$ 31,058.96

12. Individual Contribution Amount:
$ 0.00

**If the matter involves an arbitration or CFTC reparation, complete items 13-19, as appropriate.**

13. Arbitration/Reparation claim filed with FINRA, AAA, NYSE, CBOE, CFTC, etc.) and Docket/Case Number:

14. Date notice/process was served (MM/DD/YYYY):
○ Exact ○ Explanation
If not exact, provide explanation:

15. Is arbitration/reparation pending? ○ Yes ○ No

16. If the arbitration is not pending, what was the disposition?

17. Disposition Date (MM/DD/YYYY):
○ Exact ○ Explanation
If not exact, provide explanation:

18. Amount of Monetary Compensation (award, settlement, reparation amount):
$

19. Individual Contribution Amount:
$

**If the matter involves a civil litigation, complete items 20-27.**

20. Court that case was filed in (include name of Federal, Military, State or Foreign Court, Location of Court - City or County and State or Country, Docket/Case number).

21. Date notice/process was served (MM/DD/YYYY):
○ Exact ○ Explanation
If not exact, provide explanation:

22. Is the civil litigation pending? ○ Yes ○ No

23. If the civil litigation is not pending, what was the disposition?

24. Disposition Date (MM/DD/YYYY):
○ Exact ○ Explanation
If not exact, provide explanation:

25. Amount of Monetary Compensation (judgment, restitution, settlement amount):
$

26. Individual Contribution Amount:
$

27. If the action is currently on appeal enter date appeal filed (MM/DD/YYYY):
○ Exact ○ Explanation
If not exact, provide explanation:

28. Comment (Optional). You may use this field to provide a brief summary of the circumstances leading to the customer complaint, arbitration/CFTC reparation and/or civil litigation as well as the current status or final disposition(s). Your information must fit within the space provided.

No Archived Disclosure Counts

**Archived Disclosure Events**

No Archived Disclosure Events

© 2017 FINRA. All rights reserved. FINRA is a registered trademark of the Financial Industry Regulatory Authority, Inc.    Privacy │ Legal │ Terms & Conditions

# EXHIBIT 2

Topics ▾    Reference ▾    Advisors ▾    Markets ▾    Simulator ▾

Search News, Symbols, Terms          Newsletters          ▼

# The Fall Of The Market In The Fall Of 2008

By Paul Kosakowski

You May Also Like (Sponsored): Switch to OANDA - Trade commission-free. Open an account. Losses can exceed investment

Mortgage crisis. Credit crisis. Bank collapse. Government bailout. Phrases like these frequently appeared in the headlines throughout the fall of 2008, a period in which the major financial markets lost more than 30% of their value. This period also ranks among the most horrific in U.S. financial market history. Those who lived through these events will likely never forget the turmoil. So what happened, exactly, and why? Read on to learn how the explosive growth of the subprime mortgage market, which began in 1999, played a significant role in setting the stage for the turmoil that would unfold just nine years later.

## Unprecedented Growth and Consumer Debt

Subprime mortgages are mortgages targeted at borrowers with less-than-perfect credit and less-than-adequate savings. An increase in subprime borrowing began in 1999 as the Federal National Mortgage Association (widely referred to as Fannie Mae) began a concerted effort to make home loans more accessible to those with lower credit and savings than lenders typically required. The idea was to help everyone attain the American dream of home ownership. Since these borrowers were considered high-risk, their mortgages had unconventional terms that reflected that risk, such as higher interest rates and variable payments. (Learn more in *Subprime Lending: Helping Hand Or Underhanded?*)

While many saw great prosperity as the subprime market began to explode, others began to see red flags and potential danger for the economy. Bob Prechter, founder of Elliot Wave International, consistently argued that the out-of-control mortgage market was a threat to the U.S. economy as the whole industry was dependent on ever-increasing property values.

As of 2002, government-sponsored mortgage lenders Fannie Mae and Freddie Mac had extended more than $3 trillion worth of mortgage credit. In his 2002 book "Conquer the Crash", Prechter stated, "confidence is the only thing holding up this giant house of cards." The role of Fannie and Freddie is to repurchase mortgages from the lenders who originated them, and make money when mortgage notes are paid. Thus, ever-increasing mortgage default rates led to a crippling decrease in revenue for these two companies. (Learn more in *Fannie Mae, Freddie Mac And The Credit Crisis Of 2008*.)

Among the most potentially lethal of the mortgages offered to subprime borrowers were the interest-only ARM and the payment option ARM, both adjustable-rate mortgages (ARMs) . Both of these mortgage types have the borrower making much lower initial payments than would be due under a fixed-rate mortgage. After a period of time, often only two or three years, these ARMs reset. The payments then fluctuate as frequently as monthly, often becoming much larger than the initial payments. (For more on this type of mortgage, see *This ARM Has Teeth*.)

In the up-trending market that existed from 1999 through 2005, these mortgages were virtually risk-free. A borrower, having positive equity despite the low mortgage payments since his home had increased in value since the purchase date, could just sell the home for a profit in the event he could not afford the future higher payments. However, many argued that these creative mortgages were a disaster waiting to happen in the event of a housing market downturn, which would put owners in a negative equity situation and make it impossible to sell.



Refinancing Made Simple
So you can focus on everything else.

Quicken Loans
NMLS #3030

### HOT DEFINITIONS

Small Cap

Exchange-Traded Fund (ETF)

Derivative

Antitrust

Dual Listing

Chicken Tax

Looking for a financial advisor?

Topics ▾　Reference ▾　Advisors ▾　Markets ▾　Simulator ▾

Search News, Symbols, Terms　　Newsletters　　　▾

wealthiest country in the world and have all your countrymen be up to their neck in debt."

**The Subsequent Rise of Creative Mortgage-Related Investment Products**
During the run-up in housing prices, the mortgage-backed securities (MBS) market became popular with commercial investors. An MBS is a pool of mortgages grouped into a single security. Investors benefit from premiums and interest payments on the individual mortgages it contains. This market is highly profitable as long home prices continue to rise and home owners continue to make their mortgage payments. The risks however, became all too real as housing prices began to plummet and homeowners began to default on their mortgages in droves. (Learn how four major players slice and dice your mortgage in the secondary market in *Behind The Scenes Of Your Mortgage*.)

Another popular investment vehicle during this time was the credit derivative, known as a credit default swap (CDSs). CDSs were designed to be a method of hedging against a company's creditworthiness, similar to insurance. But unlike the insurance market, the CDS market was unregulated, meaning there was no requirement that the issuers of CDS contracts maintain enough money in reserve to pay out under a worst-case scenario (such as an economic downturn). This was exactly what happened with American International Group (AIG) in early 2008 as it announced huge losses in its portfolio of underwritten CDS contracts that it could not afford to pay up on. (Learn more about this investment vehicle in *Credit Default Swaps: An Introduction* and *Falling Giant: A Case Study Of AIG*.)

**Market Decline**
By March 2007, with the failure of Bear Stearns due to huge losses resulting from its involvement in having underwritten many of the investment vehicles directly linked to the subprime mortgage market, it became evident that the entire subprime lending market was in trouble. Homeowners were defaulting at high rates as all of the creative variations of subprime mortgages were resetting to higher payments while home prices declined. Homeowners were upside down - they owed more on their mortgages than their homes were worth - and could no longer just flip their way out of their homes if they couldn't make the new, higher payments. Instead, they lost their homes to foreclosure and often filed for bankruptcy in the process. (Take a look at the factors that caused this market to flare up and burn out in *The Fuel That Fed The Subprime Meltdown*.)

Despite this apparent mess, the financial markets continued higher into October of 2007, with the Dow Jones Industrial Average (DJIA) reaching a closing high of 14,164 on October 9, 2007. The turmoil eventually caught up, and by December 2007 the United States had fallen into a recession. By early July 2008, the Dow Jones Industrial Average would trade below 11,000 for the first time in over two years. That would not be the end of the decline.

On Sunday September 7, 2008, with the financial markets down nearly 20% from the October 2007 peaks, the government announced its takeover of Fannie Mae and Freddie Mac as a result of losses from heavy exposure to the collapsing subprime mortgage market. One week later, on September 14, major investment firm Lehman Brothers succumbed to its own overexposure to the subprime mortgage market, and announced the largest bankruptcy filing in U.S. history at that time. The next day, markets plummeted, and the Dow closed down 499 points at 10,917.

The collapse of Lehman cascaded, resulting in the net asset value of the Reserve Primary Fund falling below $1 per share on September 16, 2008. Investors then were informed that for every $1 invested, they were entitled to only 97 cents. This loss was due to the holding of commercial paper issued by Lehman and was only the second time in history that a money market fund's share value has "broken the buck." Panic ensued in the money market fund industry, resulting in massive redemption requests. (For related reading, see *Will Your Money Market Fund Break The Buck?* and

Looking for a financial advisor?



Refinancing Made Simple
So you can focus on everything else.

Quicken Loans
NMLS#3030

**Trading Center**





**Partner Links**

Test your forex trading skills in our FX trading simu...

Trade like a top hedge fund manager using techni... analysis and double your wealth...

Learn to trade stocks by investing $100,000 virtua... dollars...

Search News, Symbols, Terms      Newsletters    ▼

bailout began, sending the Dow up 410 points. The next day, Treasury Secretary Henry Paulson proposed that a Troubled Asset Relief Program (TARP) of as much as $1 trillion be made available to buy up toxic debt to ward off a complete financial meltdown. Also on this day, the Securities and Exchange Commission (SEC) initiated a temporary ban on short selling the stocks of financial companies, believing this would stabilize the markets. The markets surged on the news and investors sent the Dow up 456 points at an intraday high of 11,483, finally closing up 361 at 11,388. These highs would prove to be of historical importance as the financial markets were about to undergo three weeks of complete turmoil. (For more insight, see *Liquidity And Toxicity: Will TARP Fix The Financial System?*)

**Complete Financial Turmoil**
The Dow would plummet 3,600 points from the September 19, 2008, intraday high of 11,483 to the October 10, 2008, intraday low of 7,882. The following is a recap of the major U.S. events that unfolded during this historic three-week period.

- **September 21, 2008:** Goldman Sachs (NYSE:GS) and Morgan Stanley (NYSE:MS), the last two of the major investment banks still standing, convert from investment banks to bank holding companies in order to gain more flexibility for obtaining bailout funding.
- **September 25, 2008:** After a 10-day bank run, the Federal Deposit Insurance Corporation (FDIC) seizes Washington Mutual, then the nation's largest savings and loan, which had been heavily exposed to subprime mortgage debt. Its assets are transferred to JPMorgan Chase (NYSE:JPM).
- **September 28, 2008:** The TARP bailout plan stalls in Congress.
- **September 29, 2008:** The Dow declines 774 points (6.98%), the largest point drop in history. Also, Citigroup (NYSE:C) acquires Wachovia, then the fourth-largest U.S. bank.
- **October 3, 2008:** A reworked $700 billion TARP plan, renamed the Emergency Economic Stabilization Act of 2008, passes a bipartisan vote in Congress. (U.S. bailouts date all the way back to 1792. Learn how the biggest ones affected the economy in *Top 6 U.S. Government Financial Bailouts*.)
- **October 6, 2008:** The Dow closes below 10,000 for the first time since 2004.
- **October 22, 2008:** President Bush announces that he will host an international conference of financial leaders on November 15, 2008.

**Conclusion**
The events of the fall of 2008 are a lesson in what eventually happens when rational thinking gives way to irrationality. While good intentions were likely the catalyst leading to the decision to expand the subprime mortgage market back in 1999, somewhere along the way the United States lost its senses. The higher home prices went, the more creative lenders got in an effort to keeping them going even higher, with a seemingly complete disregard for the potential consequences. When one considers the irrational growth of the subprime mortgage market along with the investment vehicles creatively derived from it, combined with the explosion of consumer debt, maybe the financial turmoil of 2008 was not as unforeseeable as many would like to believe.

Find out how this tough economic period can be a learning experience for all in *The Bright Side Of The Credit Crisis*.

**Ready for the next big market move?**    SPONSORED
It doesn't matter if the markets are moving up, down, or sideways: Wall Street has strategies to make money. You can too. Learn how to invest confidently and make money in any market. Sign up for a Free Power Trading Workshop at Online Trading Academy.

Looking for a financial advisor?

Case 7:18-cv-01232-LSC Document 1-1 Filed 08/06/18 Page 34 of 42

per trade

## RELATED ARTICLES



**PERSONAL FINANCE**

### What is a Subprime Mortgage?

Subprime mortgages are offered to borrowers with low credit ratings, usually 600 or below.



**SPONSORED CONTENT**

### What does it take to land your dream job?

BY FIDELITY

Get that dream job out of your head and onto your resume. Here are a few easy steps that you can...



**PERSONAL FINANCE**

### Finding the Best Mortgage Rates in 2017

As home-buying technology has progressed, the process of finding the best mortgages rates can all be done online. Here's how:



**INVESTING**

### Who Is To Blame For The Subprime Crisis?

From lenders to buyers to hedge funds, it appears everyone has blood on their hands.



**INVESTING**

### Subprime Is Often Subpar

Proceed with caution when considering these short-term, high-interest mortgages.



**PERSONAL FINANCE**

### Shopping for a Mortgage in 2017? Use This Tool First

As home-buying technology has progressed, the process of finding the best mortgages rates for 2017 can all be done online.



**PERSONAL FINANCE**

### Behind the Scenes of Your Mortgage

Four major players slice and dice your mortgage in the secondary market.



**PERSONAL FINANCE**

### Understanding the Mortgage Payment Structure

We explain the calculation and payment process as well as the amortization schedule of home loans.



**RETIREMENT**

### Additional Streams of Income for Seniors

Find out how a reverse mortgage can work in your favor during retirement.

Looking for a financial advisor?

Search News, Symbols, Terms          Newsletters          ▾





**PERSONAL FINANCE**

Make A Risk-Based Mortgage Decision

Find out how to choose which mortgage style is right for you.

## RELATED FAQS

**Q: How much risk is associated with subprime mortgages?**

Discover the risks associated with subprime mortgages. Find out whether taking out a subprime mortgage on your home is really ... Read Answer >>

**Q: What is a subprime mortgage?**

A subprime mortgage is a type of loan granted to individuals with poor credit histories (often below 600), who, as a result ... Read Answer >>

**Q: What are the different types of subprime mortgages?**

Clarify your understanding of subprime mortgages. Learn about the different types, how they work and when they might be beneficial. Read Answer >>

**Q: Are Subprime Mortgages Still Available for Homeowners?**

Buying homes became increasingly difficult after the housing bubble burst. Since then, subprime mortgages have been making ... Read Answer >>

SMART TECHNOLOGY DESIGNED FOR YOU    PUSH BUTTON GET MORTGAGE    START HERE ▶    ROCKET MORTGAGE by Quicken Loans  NMLS #3030

Search Investopedia

DICTIONARY:    #    A    B    C    D    E    F    G    H    I    J    K    L    M    N    O    P    Q    R    S    T    U    V    W    X    Y

CONTENT LIBRARY
Articles    Terms    Videos    Guides    Slideshows    FAQs    Calculators    Chart Advisor    Stock Analysis
Stock Simulator    FXtrader    Exam Prep Quizzer    Net Worth Calculator

WORK WITH INVESTOPEDIA
About Us    Advertise With Us    Write For Us    Contact Us    Careers

CONNECT WITH INVESTO
f  t  in  ⎧  ST

GET FREE NEWSLE
Newslett

© 2017, Investopedia, LLC.    All Rights Reserved    |    Terms Of Use    |    Privacy Policy

Looking for a financial advisor?

EXHIBIT 3

# Forbes



**Great Speculations**

*Buys, holds, and hopes*

Opinions expressed by Forbes Contributors are their own.

INVESTING   12/30/2013 @ 10:03AM | 3,999 views

# History Suggests Dow's Bull Run Still Has Legs



Schaeffer's Investment Research , **Contributor**

Stocks have been extremely strong since they bottomed in March 2009, and looking at the chart below, you might get a feeling that we've come "too far, too fast" as the Dow Jones Industrial Average (DJI) sits almost 20% above the 2007 peak. Looking at the data in other ways, though, it's not quite as scary.



**10-Year Returns**: For example, the chart below indicates we have a lot further to go potentially. It shows the Dow's 10-year returns going all the way back to 1910. As good as the market has been since 2009, the 10-year rolling return is only at its long-term average of about 5%. Additionally, eyeballing the previous bull markets on the chart below shows the current one is still very young

compared to past examples. If the bears are
scaring people with the first chart above, then the
bulls can make their case with the chart below.



**Five-Year Returns**: This chart is the same
concept as above, except it shows five-year
returns rather than 10-year returns. Again, the
average is around 5% annualized — but the
current value is at 13%, which is the highest since
early 2001 (as it was falling after the tech boom
of the late 1990s). This chart is not as bullish-
looking as the previous one, but it has not been
uncommon for peaks to reach levels higher than
where we stand now.



**Dow in Ounces of Gold**: This used to be a
popular chart, but I haven't seen it for a while, as
gold has lost some of its luster (it's down about
25% this year). It's a chart that values the Dow in
ounces of gold. The value was pretty flat from
2009 through 2012, as Dow and gold both gained
significantly. The Dow's gold value jumped in
2013, though, to its current value of about 13.5
ounces — which is now above its long-term
average of about 10.5 ounces. However, the
current value is pretty small when compared to
the peak above 40 ounces in the late 1990s.



**RECOMMENDED BY FORBES**

Stocks Can Thrive With Rising Rates But REITs
Get Rocked

Agrium Looking Cheap As Fertilizer Maker Finds
Its Footing

Ride The Bull When He's Running With Cheap
Dividend Stocks

The 10 Most Dangerous U.S. Cities

Helping Out After Hurricane Harvey: Where,
What & How To Donate

This article is available online at: http://onforb.es/1ipVaa8          2017 Forbes.com LLC™   All Rights Reserved

# EXHIBIT 4



Indexology®Blog

S&P Dow Jones
Indices
A Division of S&P Global

# Inside the S&P 500: The Dividend Aristocrats

**David Blitzer**

Managing Director and Chairman of the Index Committee
S&P Dow Jones Indices

DECEMBER 12, 2014 - 4:32 PM

Dividends are ever-popular with investors, but owning dividend stocks or an ETF which tracks an index focused on dividends comes with one big worry: will the companies continue to pay dividends? One of the surest signs that a stock is about to collapse is when the company announces it is reducing or eliminating the dividend. While there is no way to guarantee that a stock will continue paying dividends, many investors look to the company's past history for some hint of what it might do in the future. For those investors, a long history of consistent payments – or better yet, consistent dividend increases – is appealing.

The thought that a long history of increasing dividends could identify companies that would make an attractive dividend focused index is the idea behind the S&P 500 Dividend Aristocrats. Companies included in the index must have a history of at least 25 years of increasing dividends and be current members of the S&P 500. (They may not have been in the S&P 500 for all 25 years). Currently there are 53 stocks in the index, including some well-known names such as ExxonMobil, Walmart, Coca-Cola and PepsiCo.

Recognizing that past performance is not a guarantee of future results, one can see the past results compared to the S&P 500. The chart shows monthly data for the S&P 500 and the S&P 500 Dividend Aristocrats, both measured as total return indices rebased to January 1990=100.



[http://www.indexology-blog.com/wp-content/uploads/2014/12/aristocrats.jpg]

Further recognition was received when the S&P 500 Dividend Aristocrats index was named the Index Product of the Year 2014 at the William F. Sharpe Indexing Achievement Awards at the annual IMN Global Indexing and ETF Conference earlier this week in Scottsdale, AZ.

Case 7:18-cv-01232-LSC   Document 1-1   Filed 08/06/18   Page 42 of 42

The posts on this blog are opinions, not advice. Please read our DISCLAIMERS [HTTP://US.SPINDICES.COM/REGULATORY-AFFAIRS-DISCLAIMERS/] .

Copyright © 2017 S&P Dow Jones Indices LLC, a division of S&P Global. All rights reserved.